No. 23-15490

# In the United States Court of Appeals for the Ninth Circuit

ASSURANCE WIRELESS USA, L.P.; METROPCS CALIFORNIA, LLC; SPRINT SPECTRUM LLC; T-MOBILE USA, INC.; and T-MOBILE WEST LLC,

Plaintiffs-Appellants,

v.

ALICE B. REYNOLDS, *President of the California Public Utilities Commission, in her official capacit*y; KAREN DOUGLAS, *Commissioner of the California Public Utilities Commission, in her official capacity*; DARCIE L. HOUCK, *Commissioner of the California Public Utilities Commission, in her official capacity*; JOHN REYNOLDS, *Commissioner of the California Public Utilities Commission, in his official capacity*; and GENEVIEVE SHIROMA, *Commissioner of the California Public Utilities Commission, in her official capacity*,

Defendants-Appellees,

On Appeal from the United States District Court
for the Northern District of California, San Francisco Division
Case No. No. 3:23-cv-00483-LB, Magistrate Judge Laurel Beeler

## APPELLANTS' EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY OR INJUNCTION PENDING APPEAL AND ADMINISTRATIVE STAY
### ACTION REQUESTED BY <u>MAY 1, 2023</u>

Kathy Kizer
DLA PIPER LLP (US)
555 Mission Street, #2400
San Francisco, CA 94105

Ben C. Fabens-Lassen
Gaspard Rappoport
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067

Peter Karanjia
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
(202) 799-4135
peter.karanjia@dlapiper.com

*Attorneys for Plaintiffs-Appellants*

**CIRCUIT RULE 27-3 CERTIFICATE FOR EMERGENCY MOTION**

Pursuant to Ninth Circuit Rule 27-3, Appellants-Plaintiffs ("Appellants") certify as follows:

***Relief Requested***. Appellants respectfully request (1) an emergency stay or injunction pending appeal of a rule adopted by Appellees (the California Public Utilities Commission or "CPUC") in Decision 22-10-021, 2022 WL 16782574 (Cal. P.U.C. Oct. 20, 2022) (the "Connections-Based Rule"); and (2) an immediate administrative stay of the Connections-Based rule while this Court adjudicates this emergency motion (the "Motion").

Because the Decision directs Appellants to start complying with the Connections-Based Rule on April 1, 2023, Appellants are already suffering ongoing, irreparable harms from the Rule and therefore respectfully request an **<u>immediate administrative stay</u>** (pending adjudication of this Motion) and action on the request for a stay pending appeal as soon as possible and in any event by **<u>May 1, 2023</u>**.

Absent this requested relief, as detailed in this Motion, Appellants will continue to suffer severe and irreparable harms, including financial losses (not recoverable due to the CPUC's Eleventh Amendment immunity) of nearly $11 million per month, loss of business and customer goodwill, and reputational harm. The District Court acknowledged that Appellants established irreparable harm.

***Appellants' Prompt Action and Efforts to Obtain Relief from District Court.***
Appellants could not have filed this Motion earlier because they filed this Motion
the following day after the District Court (Beeler, M.J.) denied an emergency motion
for a stay pending appeal. Appellants promptly sought this relief from the District
Court, filing their emergency motion the next business day (Monday, April 3, 2023)
after the District Court denied Appellants' request for a preliminary injunction to
enjoin enforcement of the Connections-Based Rule. (The parties received notice of
that order shortly after midnight on Saturday, April 1, 2023.) Appellants filed their
preliminary injunction motion on February 1, 2023. Before filing that motion,
Appellants also asked the CPUC to stay the Connections-Based Rule, which it has
declined to do.

***Advance Notice to Court and Appellees.*** On April 10, 2023, before filing this
Motion, counsel for Appellants notified the Ninth Circuit court staff by both
telephone and email of the forthcoming Motion.

In addition, the same day and before filing the Motion, counsel for Appellants
emailed counsel for Appellees[1] about the forthcoming Motion. Appellees oppose the
Motion.

The names and best contact information for each counsel/party notified (all
counsel for Appellees) are as follows:

---

[1] There are no other parties (including unrepresented parties) to this case.

David W. Fermino, Jonathan Koltz, Ian Culver, and Vanessa Baldwin
California Public Utilities Commission, Legal Division
Telephone: 415-696-7359

Emails:  david.fermino@cpuc.ca.gov, ian.culver@cpuc.ca.gov,
         vanessa.young@cpuc.ca.gov, jonathan.koltz@cpuc.ca.gov

I declare under penalty of perjury that the foregoing is true.

Executed on April 10, 2023 in Washington, D.C.

/s/ Peter Karanjia
Peter Karanjia
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
Tel.: (202) 799-4135
peter.karanjia@dlapiper.com

*Counsel for Appellants-Plaintiffs*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Ninth Circuit Rule 26.1, Appellants provide the following corporate disclosure statement:

1.     Appellant Assurance Wireless USA, L.P. ("Assurance"), a Delaware limited partnership, Appellant MetroPCS California, LLC ("MetroPCS"), a Delaware limited liability company, Appellant Sprint Spectrum LLC ("Sprint Spectrum"), a Delaware limited liability company, and Appellant T-Mobile West LLC ("T-Mobile West"), a Delaware limited liability company, are all wholly owned subsidiaries of Appellant T-Mobile USA, Inc., a Delaware corporation.

2.     Appellant T-Mobile USA, Inc., is a wholly owned subsidiary of T-Mobile US, Inc., a Delaware corporation.

3.     T-Mobile US, Inc. (NASDAQ: TMUS) is a publicly traded company listed on the NASDAQ Global Select Market of NASDAQ Stock Market LLC.

4.     Deutsche Telekom Holding B.V., a limited liability company (besloten vennootschap met beperkte aansprakelijkheidraies) organized and existing under the laws of the Netherlands ("DT B.V."), owns more than 10% of the shares of T-Mobile US, Inc. DT B.V. is a direct wholly owned subsidiary of T-Mobile Global Holding GmbH ("Holding"), a Gesellschaft mit beschränkter Haftung organized and existing under the laws of the Federal Republic of Germany.

5.     Holding is, in turn, a direct wholly owned subsidiary of T-Mobile Global Zwischenholding GmbH ("Global"), a Gesellschaft mit beschränkter Haftung organized and existing under the laws of the Federal Republic of Germany.

6.     Global is a direct wholly owned subsidiary of Deutsche Telekom AG, an Aktiengesellschaft organized and existing under the laws of the Federal Republic of Germany ("Deutsche Telekom"). The principal trading market for Deutsche Telekom's ordinary shares is the trading platform "Xetra" of Deutsche Börse AG. Deutsche Telekom's ordinary shares also trade on the Frankfurt, Berlin, Düsseldorf, Hamburg, Hannover, München, and Stuttgart stock exchanges in Germany. Deutsche Telekom's American Depositary Shares ("ADSs"), each representing one ordinary share, trade on the OTC market's highest tier, OTCQX International Premier (ticker symbol: "DTEGY").

April 10, 2023                              DLA PIPER LLP (US)


                                            */s/ Peter Karanjia*
                                            Peter Karanjia
                                            DLA Piper LLP (US)
                                            500 Eighth Street, NW
                                            Washington, D.C. 20004
                                            Tel.: (202) 799-4135
                                            peter.karanjia@dlapiper.com

                                            *Counsel for Appellants-Plaintiffs*

# TABLE OF CONTENTS

Circuit Rule 27-3 Certificate for Emergency Motion ..................................i

Corporate Disclosure Statement ..............................................iv

Introduction ...................................................................1

Background ....................................................................3

I.    Factual Background ....................................................3

    A.    The Parties ......................................................3

    B.    Regulatory Framework .............................................3

    C.    CPUC Rulemaking .................................................5

II.    Procedural History ....................................................7

Applicable Standards ..........................................................8

Argument ......................................................................8

    A.    Appellants Are Likely to Succeed on Appeal. ......................9

        1.    The CPUC Rule Is "Inconsistent With" FCC Rules..............9

        2.    The CPUC Rule Is Not Competitively Neutral. ................16

    B.    Appellants Will Suffer Irreparable Harm, As the District Court Found, While the CPUC and Third Parties Will Suffer No Harm. ...........................................................19

    C.    The Public Interest Decisively Supports a Stay. ................22

Conclusion ...................................................................22

Certificates of Compliance and Service

Exhibit A – April 9, 2023 Order Denying Stay Pending Appeal

Exhibit B – March 31, 2023 Order Denying Preliminary Injunction

Exhibit C – Challenged CPUC Decision

Exhibit D – Declaration of John Barnes in Support of Motion

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado v. Wolf*,
    952 F.3d 999 (9th Cir. 2020) ...............................................................8

*AT&T Commc'ns, Inc. v. Eachus*,
    174 F. Supp. 2d 1119 (D. Or. 2001) ...................................................9

*AT&T Corp. v. PUC of Tex.*,
    252 F. Supp. 2d 347 (W.D. Tex. 2003) ...................................3, 12, 14

*Azurin v. Von Raab*,
    792 F.2d 914 (9th Cir. 1986) .............................................................18

*Boardman v. Pac. Seafood Grp*,
    822 F.3d 1011 (9th Cir. 2016) ...........................................................21

*City of Arlington, Tex. v. FCC*,
    569 U.S. 290 (2013) ...........................................................................11

*Ecological Rts. Found. v. PG&E Co.*,
    874 F.3d 1083 (9th Cir. 2017) .................................................9, 10, 16

*Feldman v. Arizona Sec'y of State's Off.*,
    843 F.3d 366 (9th Cir. 2016) ...............................................................8

*F.T.C. v. Qualcomm Inc.*,
    935 F.3d 752 (9th Cir. 2019) .......................................................1, 2, 8

*In re EPA*, 803 F.3d 804 (6th Cir. 2015) ..............................................21

*Koon v. United States*,
    518 U.S. 81 (1996) .............................................................................11

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) .....................................................2, 8, 18

*MetroPCS Cal., LLC v. Picker*,
    970 F.3d 1106 (9th Cir. 2020) .........................................5, 8, 16, 17

vii

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ............................................................................ 10

*Mozilla Corp. v. FCC*,
    940 F.3d 1 (D.C. Cir. 2019) ............................................................... 11

*Olympic Pipe Line Co. v. City of Seattle*,
    437 F.3d 872 (9th Cir. 2006) ................................................................ 9

*R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*,
    29 F.4th 542 (9th Cir. 2022) ................................................................. 9

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) ......................................................... 20

*Small v. Avanti Health Sys., LLC*,
    661 F.3d 1180 (9th Cir. 2011) ........................................................... 22

*Tex. Off. of Pub. Util. Couns. v. FCC*,
    183 F.3d 393 (5th Cir. 1999) ........................................................ 4, 17

*The Util. Reform Network v. CPUC*,
    26 F. Supp. 2d 1208 (N.D. Cal. 1997) ......................................... 11, 12

*U.S. Telecom Ass'n v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016) ........................................................... 10

**Administrative Decisions**

*Alternative Contribution Methodologies*,
    18 FCC Rcd. 3006 (2003) .................................................................... 4

*Fed.-State Joint Bd. on Universal Serv.*,
    12 FCC Rcd. 8776 (1997) ................................... 4, 5, 12, 14, 15, 16

*Fed.-State Joint Bd. on Universal Serv.*,
    15 FCC Rcd. 20769 (1999) .................................................................. 4

*Federal-State Joint Bd. on Universal Serv.*,
    16 FCC Rcd. 9892 (2001) .................................................................... 4

*Federal-State Joint Bd. on Universal Serv.*,
    17 FCC Rcd. 24952 (2002) .................................................................. 4

*High-Cost Universal Serv. Support, Appendix A*,
　　24 FCC Rcd. 6475 (2008)......................................................................4

*Matter of Level 3 Commc'ns, LLC*,
　　33 FCC Rcd. 2388 (2018)....................................................................17

*Protecting & Promoting the Open Internet*,
　　30 FCC Rcd. 5601 (2015)....................................................................10

*Restoring Internet Freedom*,
　　33 FCC Rcd. 311 (2018).......................................................................11

*Role of the Universal Serv. Fund & Intercarrier Comp. in the Nat'l
　　Broadband Plan*,
　　24 FCC Rcd. 13757 (2009)...................................................................4

*Universal Service Contribution Methodology*,
　　27 FCC Rcd. 5357 (2012)..................................................4, 12, 15, 16

**Statutes**

47 U.S.C. § 254(f).................................... 1, 3, 2, 5, 9, 10, 11, 12, 13, 14, 15, 16, 18

**Regulations**

47 C.F.R. § 54.709(a)...........................................................................4, 10

**Other Authorities**

Settlement Agreement and Release of Claims,
　　https://oag.ca.gov/system/files/attachments/press-
　　docs/CA%20Settlement%20Agreement%20%283.9%20fully%20e
　　xecuted%29.pdf ................................................................................18

2022 Telecommunications Reporting Worksheet Instructions (FCC
　　Form 499-A), https://www.usac.org/wp-content/uploads/service-
　　providers/documents/forms/2022/2022-FCC-Form-499A-Form-
　　Instructions.pdf ................................................................................15

## ADDENDUM EXHIBITS

| | |
|---|---|
| Exhibit A | District Court's April 9, 2023 Order Denying Motion for a Stay Pending Appeal (Dkt. 47.[2]) |
| Exhibit B | District Court's April 1, 2023 Order Denying Preliminary Injunction (Dkt. 37.) |
| Exhibit C | California Public Utilities Commission's decision adopting the rule challenged in this action, captioned "*Decision Updating the Mechanism for Surcharges to Support Public Purpose Programs*" (Decision 22-10-021 released Oct. 24, 2022) (Dkt. 4-2.) |
| Exhibit D | Declaration of John Barnes in Support of Plaintiffs' Motion for Preliminary Injunction (Dkt. 4-14.) |

---

[2] All docket references in the Motion and Addendum are to the District Court's docket.

**INTRODUCTION**

Appellants are wireless carriers that seek an emergency stay or injunction pending appeal—and administrative stay pending resolution of this motion—of an unlawful decision of the California Public Utilities Commission ("CPUC"). The decision fundamentally overhauls how the CPUC assesses surcharges on communications services to fund its "universal service" programs. It does so by switching from a methodology that calculates surcharges ***based on revenues*** from intrastate services provided to subscribers (specifically, a surcharge calculated as a percentage of revenues from intrastate voice service) to a methodology ***based on connections or "access lines"*** (a flat fee, regardless of how much intrastate voice service subscribers purchase and use). This new methodology will shift the burden of millions of dollars in monthly surcharges from local exchange carriers to wireless carriers and their customers. It is not only a dramatic change from how the CPUC has long assessed charges to fund "universal service" programs, but is also inconsistent with how the Federal Communications Commission does so. The CPUC's decision is thus preempted by federal law (47 U.S.C. § 254(f)) and should not be enforced during this appeal. The decision directs Appellants to start implementing the new connections-based rule on April 1, 2023.

A stay pending appeal is warranted where, as here, the movant has shown "reasonable probability" or "fair prospect" of appellate success, *F.T.C. v. Qualcomm*

1

*Inc.*, 935 F.3d 752, 755 (9th Cir. 2019), or a "substantial case on the merits," *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011), as well as the traditional equitable requirements of irreparable harm and public-interest considerations favoring a stay. *Id.* at 968-70.

A stay or injunction pending appeal and administrative stay are warranted. *First*, Appellants are likely to succeed on their preemption challenges to the CPUC rule because the rule: (i) is "inconsistent with" the FCC's counterpart rules, and (ii) it violates the FCC's competitive-neutrality requirement. 47 U.S.C. § 254(f). *Second*, the rule already exposes Appellants to severe, irreparable harms—as the District Court found—including unrecoverable financial losses of ***nearly $11 million per month*** and loss of business and customer goodwill. *Third*, neither the CPUC nor third parties will be prejudiced if a stay is granted. *And fourth*, the public interest strongly favors granting a stay, as demonstrated both by the *amicus* brief filed below by civil rights organizations and by consumer groups' objections to the rule. Both expressed concern that the rule will hurt low-income consumers who heavily rely on wireless services and can least afford their surcharges to quadruple.

# BACKGROUND

## I.   Factual Background

### A.   The Parties

Appellants are wireless carriers that are subject to the CPUC's new rule. Appellants offer (i) "tax-inclusive" plans, which include all taxes, fees, and surcharges in a fixed, "all-in," monthly price, and (ii) "tax-exclusive plans," under which customers pay taxes, fees, and surcharges in addition to a monthly price. Exhibit D ¶¶8-13. Appellees are the CPUC commissioners.

### B.   Regulatory Framework

In the Communications Act, Congress empowered the FCC to preserve and advance "universal service"—nationwide access to communications services. 47 U.S.C. § 254. The FCC has done so by requiring telecommunications providers to contribute to the federal Universal Service Fund, which subsidizes such services. These providers "pay a portion of their international and interstate telecommunications revenues" into the Fund. *AT&T Corp. v. PUC of Tex.*, 252 F. Supp. 2d 347, 349-50 (W.D. Tex. 2003), *aff'd*, 373 F.3d 641 (5th Cir. 2004). The FCC has exempted mobile broadband and text messaging services from these contributions and has prohibited States from imposing state universal service surcharges on those services. *See infra* at 10-11. States are permitted to assess surcharges only on intrastate voice calling.

3

For decades, the FCC has required carriers to use this *revenues-based methodology* when remitting federal universal service fees. 47 C.F.R. § 54.709(a), (a)(3). The FCC has periodically considered whether to switch to a *connections-based* approach for federal contributions.[3] Yet, each time, the FCC declined to do so.

The FCC recognized that its longstanding revenues-based approach best preserves and advances universal service because that approach is competitively neutral, easily administrable, and avoids economic distortions. *Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. 8776, 8797, 9206-07, ¶¶40, 844-45 (1997) ("*1997 Order*"), *aff'd in part, rev'd in part, and remanded in part on other grounds*, *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393 (5th Cir. 1999) ("*TOPUC*"); *Fed.-State Joint Bd. on Universal Serv.*, 15 FCC Rcd. 20769, 20772, ¶5 (1999).

On the other hand, the FCC expressed grave concerns about a connections-based approach. The FCC highlighted logistical obstacles, including that, "[u]nlike revenues, 'connections' is not a universally-recognized or tracked unit." *2012 Notice*, ¶226. And the FCC cautioned that the "industry as a whole has not reached

---

[3] *E.g.*, *Universal Serv. Contribution Methodology*, 27 FCC Rcd. 5357, 5399, ¶96 (2012) ("*2012 Notice*"); *Role of the Universal Serv. Fund & Intercarrier Comp. in the Nat'l Broadband Plan*, 24 FCC Rcd. 13757, 13758 (2009); *High-Cost Universal Serv. Support*, Appendix A, 24 FCC Rcd. 6475, 6536, ¶92 (2008); *Alternative Contribution Methodologies*, 18 FCC Rcd. 3006, 3006 (2003); *Federal-State Joint Bd. on Universal Serv.*, 17 FCC Rcd. 24952, 24985-86, ¶72 (2002); *Federal-State Joint Bd. on Universal Serv.*, 16 FCC Rcd. 9892, 9894, ¶2 (2001).

consensus about whether connections-based assessments are the best way to reform the contribution system." *Id.* ¶222. After repeatedly revisiting the issue, the FCC continues to mandate a revenues-based contribution mechanism.

While Congress has authorized States to create universal service programs, it has explicitly limited their authority to do so in several ways. *See* 47 U.S.C. § 254(f). Two of those limitations are relevant here. *First*, state universal service rules must not be "inconsistent with" the FCC's "rules to preserve and advance universal service." *Id. Second*, state universal service rules must require contributions on an "equitable and nondiscriminatory basis." *Id.* This mandate encompasses the "[t]he principle of competitive neutrality." *1997 Order*, ¶47. Any state universal service requirement that unfairly disadvantages one class of providers as compared with another class violates the competitive-neutrality principle and is preempted. *MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1120-21 (9th Cir. 2020).

The CPUC has created its own universal service programs. Like the FCC, for decades, the CPUC used a revenues-based approach to fund these programs—*i.e.*, by assessing surcharges on carriers' intrastate telecommunications service revenues. Exhibit C (CPUC Decision) at 3.

## C.    CPUC Rulemaking

In the challenged Decision, the CPUC fundamentally overhauled its surcharge system by switching from its longstanding revenues-based approach to a

5

connections-based approach, effective April 1, 2023. Under the new rule, Appellants (and other carriers) must assess and remit a flat surcharge amount of $1.11 per connection (or "access line"). *Id.* at 76. They must do so regardless of the services used by customers or the amount of revenues earned from each service.

The Decision adopted a recommendation by CPUC staff, who perceived the need for drastic reform because the "intrastate revenue billing base" for surcharges had been declining in recent years as consumers use more nonsurchargeable broadband services than surchargeable intrastate voice calling. Dkt. 4-5 at 3-4.

But the staff did not identify any underfunding of the Commission's universal service programs. Indeed, it is undisputed that the CPUC can (and does) maintain full and stable funding of those programs under its revenues-based approach by simply "increas[ing] the surcharge amount" as needed. Dkt. 28 at 5. The CPUC staff confirmed that if "a program's remittance rate requires an increase or decrease to reflect the program's support needs, the Commission adopts these changes via a resolution." Dkt. 4-5 at 9. The staff acknowledged rate adjustments as recent as December 2020 and that any "program revenue decrease will be mitigated by a surcharge rate increase." *Id.* at 13. Moreover, commenters highlighted a recent influx of billions of dollars in federal universal service funding that California can use. Dkt. 4-9 at 10-12.

The wireless industry, consumer groups, and individual consumers opposed a

connections-based rule. Dkt. 4-7 to 4-12. They highlighted both its legal infirmities and inequitable impact, stressing that the rule would be inherently regressive and hit low-income consumers the hardest. *See* Dkt. 1 ¶¶57-61. One consumer group, for example, explained that the new rule would "unfairly shift[] the burden of … support onto the shoulders of residential customers who are already reeling from the impact of inflation and the lingering impact of the COVID-19 pandemic." Dkt. 4-10 at 1, 8-9. And it calculated that the annual surcharge burden would more than *quadruple* for a typical family with four wireless lines—from $13 to more than $53—with an especially acute impact on lower-income "communities that are more likely to rely on wireless mobile service." *Id.* at 7. These concerns were echoed by individual consumers (Dkt. 4-12), and civil rights groups participating as *amici* below. Dkt. 23 (Amicus Br. for Multicultural Media, Telecom & Internet Council, ALLvanza, NAACP (CA/HI Chapters), and LatinoJustice) at 4-10. They explained that the surcharge increase "will force low-income individuals that rely mobile wireless services to access broadband to lose that access." *Id.* at 3.

## II.    Procedural History

Appellants filed this action on February 1, 2023 and sought a preliminary injunction to enjoin enforcement of the connections-based rule the same day.  Dkt. 1, 4. Shortly after midnight on April 1, 2023—the new rule's effective date—Appellants received notice that the District Court denied their motion. Exhibit B.

The next business day, Appellants appealed that order and sought an emergency stay pending appeal. Dkt. 38-39. The District Court denied that relief on April 9 for the same reasons that it denied a preliminary injunction. Exhibit A. Appellants filed this emergency motion the following business day.

## APPLICABLE STANDARDS

For a stay or injunction pending appeal, this Court applies the traditional factors for injunctive relief—evaluating on a "sliding scale" the likelihood of success on the merits, irreparable harm, the balance of the equities, and the public interest. *Leiva-Perez*, 640 F.3d at 966-67; *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016). "'If anything, a flexible approach is even *more* appropriate in the stay context.'" *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020).

Appellants need not show success on the merits is "more likely than not." *Leiva-Perez*, 640 F.3d at 966. A "reasonable probability" or "fair prospect" of success is sufficient. *Qualcomm*, 935 F.3d at 755. Appellants can also prevail by demonstrating a "substantial case for relief on the merits." *Leiva-Perez*, 640 F.3d at 967-68.

Federal preemption "is 'a question of law reviewed de novo.'" *MetroPCS*, 970 F.3d at 1117.

## ARGUMENT

Appellants meet all the requirements for a stay or injunction pending appeal.

**A.      Appellants Are Likely to Succeed on Appeal.**

**1.      The CPUC Rule Is "Inconsistent With" FCC Rules.**

The CPUC's connections-based rule is expressly preempted by 47 U.S.C. § 254(f) because it is facially "inconsistent with" the FCC's revenues-based rule.

"To determine whether the [statute] preempts [state] action, we begin with the statutory text." *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877 (9th Cir. 2006).[4] Section 254(f) provides that "[a] State may adopt regulations *not inconsistent with* the [FCC's] rules to preserve and advance universal service." 47 U.S.C. § 254(f) (emphasis added). The statute thus expressly preempts and "constrains state regulation by prohibiting regulations inconsistent with FCC rules to preserve and advance universal service." *AT&T Commc'ns, Inc. v. Eachus*, 174 F. Supp. 2d 1119, 1123 (D. Or. 2001). This Court has defined "inconsistent" to mean "incompatible, incongruous, [or] inharmonious." *Ecological Rts. Found. v. PG&E Co.*, 874 F.3d 1083, 1095 (9th Cir. 2017) (citing dictionary definitions).[5]

---

[4] "[T]he Supreme Court has already determined that if a 'statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542, 553 n.6 (9th Cir. 2022).

[5] The District Court sought to distinguish *Ecological Rights Foundation* because it was "not a preemption case." Exhibit B at 12. But that is irrelevant. The case illustrates the proper approach to statutory interpretation: To construe the phrase "not inconsistent with the requirements of such Acts" in a federal statute, this Court first observed that the statute did not define the term "inconsistent" and then it "consult[ed] the dictionary definition of the term." 874 F.3d at 1095. The same

The *connections-based* rule is expressly preempted by Section 254(f) because the rule is "inconsistent with" the FCC's universal service rule requiring providers to use a *revenues-based* contribution mechanism. *See* 47 C.F.R. § 54.709(a), (a)(3). The CPUC's new approach is not only "incongruous" and "inharmonious" with the FCC's longstanding approach, *Ecological Rts. Found.*, 874 F.3d at 1095, it is directly at odds with it. The CPUC's rule is therefore "inconsistent with" the FCC's "rule[] to preserve and advance universal services" and preempted by Section 254(f).

Recent FCC decisions confirm that Section 254(f) expressly preempts state universal service rules that, as here, materially diverge from the FCC's rules to preserve and advance universal service. In 2015, for example, the FCC reasoned that "[b]ecause our action today precludes … federal universal service contribution assessments on broadband Internet access services that are not currently assessed, we conclude that any state requirements to contribute to state universal service support mechanisms that might be imposed on such broadband Internet access services would be inconsistent with federal policy and therefore *are preempted by section 254(f).*" *Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601, 5837 n.1477 (2015) (emphasis added), *pets. for rev. denied*, *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *cert. denied*, 139 S. Ct. 475 (2018). The FCC thus

---

approach applies here. *E.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (consulting dictionary to determine "ordinary meaning" of words in preemption case).

recognized that where it has adopted a rule to preserve and advance universal service, as here, any counterpart state universal service rule must align with the FCC rule.[6] Three years later, the FCC reaffirmed that interpretation of Section 254(f). *Restoring Internet Freedom*, 33 FCC Rcd. 311, 787 n.1658 (2018), *vacated in part on other grounds*, *Mozilla Corp. v. FCC*, 940 F.3d 1, 74 (D.C. Cir. 2019). These interpretations are entitled to deference. *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 307 (2013).

In finding no inconsistency here, the District Court committed several legal errors. *See Koon v. U.S.*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law").

*First*, the Court erred by effectively reading Section 254(f)'s "inconsistent with" limitation on state authority out of the statute. *See* Exhibit B at 13 (reasoning that the CPUC has "'discretion to determine the manner in which carriers should contribute'" (quoting *The Util. Reform Network v. CPUC*, 26 F. Supp. 2d 1208, 1214

---

[6] The District Court missed this point when attempting to distinguish the FCC's decisions. What matters is not whether the CPUC rule here "assess[es] surcharges on broadband" or that the FCC relied on its "forbearance" authority (*i.e.*, statutory authority to exempt common carriers from regulatory requirements that would otherwise apply) when deciding not to assess federal universal service fees on broadband. Exhibit B at 14. Rather, the salient point is that the CPUC rule diverges from an FCC rule to preserve and advance universal service and thus flouts the consistency mandate that the FCC recognized is encompassed in Section 254(f).

(N.D. Cal. 1997) ("*TURN*")).[7] While Section 254(f) authorizes state PUCs to craft

universal service rules, it cabins that authority by providing—*in addition to* other

explicit limitations—that any such rules must not be "inconsistent with" the FCC's

rules to preserve and advance universal service:

> A State may adopt regulations *not inconsistent with* the Commission's
> rules to preserve and advance universal service. Every
> telecommunications carrier that provides intrastate telecommunications
> services shall contribute, on an equitable and nondiscriminatory basis,
> in a manner determined by the State to the preservation and
> advancement of universal service in that State. A State may adopt
> regulations to provide for additional definitions and standards to
> preserve and advance universal service within that State *only to the*
> *extent that* such regulations adopt additional specific, predictable, and
> sufficient mechanisms to support such definitions or standards that *do*
> *not rely on or burden* Federal universal service support mechanisms.

*Id.* (emphasis added). The first sentence contains the consistency mandate, and the

remaining sentences further limit state authority. *E.g.*, *AT&T*, 252 F. Supp. 2d at 350

(Section 254(f) both grants and restricts state authority in numerous ways). The

---

[7] The Court's heavy reliance on *TURN* is misplaced. *TURN* involved an unsuccessful
challenge to the CPUC's *revenues-based* regime (specifically, its use of an end-user
surcharge paid by customers)—that is, the regime the CPUC should *retain*. The
*TURN* court rejected the consumer group's challenge. But the FCC order that the
court analyzed to determine whether there was any actionable inconsistency
expressly allowed carriers to pass through their federal universal service fees to
customers—the same result as the CPUC's end-user surcharge. *See 1997 Order*,
¶¶853-55; *TURN*, 26 F. Supp. 2d at 1214-15; *see also 2012 Notice*, ¶9 (carriers
"commonly recover their [federal] universal service contribution costs from their
customers"). Accordingly, there was consistency between the relevant rules in
*TURN*, whereas there is a clear *inconsistency* here. In any event, *TURN* was never
reviewed (much less endorsed) by this Court.

District Court acknowledged these other limitations on state authority in Section 254(f)—for instance, noting that state universal service rules must not "'rely on or burden Federal universal service support mechanisms.'" Exhibit B at 13-14.

But the Court erred in suggesting that compliance with those baseline requirements resolves any inconsistency concerns. For example, a CPUC rule that does not "rely on or burden Federal universal service support mechanisms" would still be preempted if it were "inconsistent with" an FCC rule to preserve and advance universal service. Likewise, a CPUC rule can be preempted as "inconsistent with" a counterpart FCC rule even if the CPUC believes its rule will create "a 'standard[] to preserve and advance universal service within' California." Exhibit B at 14. In short, the statutory text is clear that Section 254(f)'s consistency mandate applies *in addition to* the other limitations on the CPUC's authority; indeed, that overarching mandate appears in the very first sentence of Section 254(f). Thus, the fact that the CPUC otherwise may adopt "additional definitions and standards to preserve and advance universal service within" California (*id.* at 12-13) does not give the agency a blank check to adopt rules that are incongruous with FCC rules to preserve and advance universal service. Under that flawed interpretation, the statute would be at war with itself.

*Second*, the District Court incorrectly suggested the CPUC could override the "inconsistent with" express preemption provision simply by announcing that *its* rules

are designed to advance universal service. *See id.* at 14 ("The PUC rule is not 'inconsistent with the Commission's rules to preserve and advance universal service.' In fact, the PUC adopted the rule to advance universal service."). In finding no preemption simply because the CPUC aims to advance universal service, the Court turned the statutory scheme on its head. Under the "inconsistent with" provision, the inquiry is not whether *state PUC rules* preserve and advance universal service (as the Court suggested), but rather whether *FCC rules* "preserve and advance universal service"; if so, those federal rules expressly preempt any inconsistent state PUC rules—regardless of the PUC's policy goals.

That conclusion follows not only from the statutory text, but also the structure of the statutory scheme. The "inconsistent with" provision makes clear that *the FCC*—not each of the fifty state PUCs—is preeminent in setting universal service policy. *E.g.*, *1997 Order*, ¶818 ("[S]ection 254 demonstrates that the [FCC] ultimately is responsible for ensuring sufficient support mechanisms"). As a matter of both statutory interpretation and common sense, a state cannot evade preemption simply by declaring that its own rule is best designed to advance universal service. That would deprive Section 254(f)'s consistency mandate of all meaning. *See AT&T*, 252 F. Supp. 2d at 351 (rejecting argument that state PUCs "were given the broad authority to enact any measure they see fit" to preserve universal service).

14

*Third*, the Court reasoned that "a "different' approach is not necessarily 'inconsistent.'" Exhibit B at 14. But Plaintiffs are not arguing that *any* variance between federal and state rules—no matter how trivial—would trigger preemption under Section 254(f). For example, there would be no preemption if the CPUC required carriers to report their revenues on paper forms, while the FCC requires similar reporting online.[8] That is because the latter requirement is not an FCC "rule[] to preserve and advance universal service." 47 U.S.C. § 254(f). But it is undisputed that the FCC's revenues-based rule at issue here is one to preserve and advance universal service. *See 1997 Order*, ¶¶40, 844-45 (revenues-based approach is competitively neutral, easily administrable, and avoids economic distortions).

Nor is the CPUC rule merely different from the FCC's rule in some immaterial respect: It determines the fundamental question of how to calculate universal service fees (with multi-million-dollar consequences) and is diametrically opposed to the FCC's approach to the same issue. It is therefore "inconsistent with" that approach under Section 254(f). The incongruity between the two rules is highlighted by the FCC's serious concerns with a connections-based mechanism. *See 2012 Notice*, ¶¶225, 226. And this incongruity is underscored by the fact that the FCC has periodically considered shifting from a revenues-based to a connections-based

---

[8] *See* https://www.usac.org/wp-content/uploads/service-providers/documents/forms/2022/2022-FCC-Form-499A-Form-Instructions.pdf at 13-14.

mechanism, but has declined to do so at every turn. *See supra* at 4-5. Indeed, the FCC admonished that "the industry as a whole has not reached consensus about whether connections-based assessments are the best way to reform the contribution system." *2012 Notice*, ¶222.

The CPUC's connections-based rule is "incompatible, incongruous, [and] inharmonious" with the FCC's revenues-based rule. *Ecological Rts. Found.*, 874 F.3d at 1095. It is therefore "inconsistent with" the FCC's rule and expressly preempted by Section 254(f).

### 2. The CPUC Rule Is Not Competitively Neutral.

Appellants likely will succeed on their challenge to the connections-based rule for the independent reason that the rule is not competitively neutral. "To the extent a state regulation violates that competitive neutrality requirement, the regulation is preempted." *MetroPCS*, 970 F.3d at 1121.

The competitive-neutrality requirement prohibits States from adopting any universal service rule that "unfairly advantage[s] []or disadvantage[s] one provider over another." *1997 Order*, ¶47. The CPUC's rule does exactly that. It unfairly discriminates against Appellants Assurance and MetroPCS when they are providing wireless services to low-income subscribers who receive support under the federal Affordable Connectivity Program ("ACP"). That is because carriers who serve low-income participants in the California "LifeLine" program are exempt from the

CPUC's new surcharge. *See* Exhibit C at 75. But Assurance and MetroPCS—as providers of the *same* services to the *same* constituency of low-income individuals who receive ACP support—were denied an exemption. As a result, they will have to pay the new $1.11 surcharge for every low-income subscriber who receives ACP support, while carriers that exclusively serve LifeLine participants pay no such surcharges. This violates the competitive-neutrality requirement because both types of carriers provide the same mobile broadband services to low-income consumers. *See MetroPCS*, 970 F.3d at 1123.

The District Court erred in rejecting this argument. It reasoned that Assurance and MetroPCS "each have only 'thousands' [of subscribers] in the Affordable Connectivity Program," suggesting this could immunize the CPUC from preemption. Exhibit B at 16-17. There is no basis for the Court's novel theory that a competitive-neutrality violation can be excused because it affects "only thousands" of customers. *See TOPUC*, 183 F.3d at 434-35 (carrier with very little revenues from surchargeable services established competitive-neutrality violation). If accepted, that flawed theory would give state regulators free rein to adopt discriminatory rules so long as those rules target smaller providers with few customers. That is contrary to both Section 254(f)'s text and the purpose of competitive neutrality—to create a level playing field among carriers. *E.*g., *Matter of Level 3 Commc'ns, LLC*, 33 FCC Rcd. 2388, 2394 ¶17 (2018).

The Court also erred in concluding there can be no competitive-neutrality violation because CPUC "surcharges are born[e] by users." Exhibit B at 16-17. This overlooks that all plans offered by Assurance and MetroPCS are tax-inclusive (Exhibit D ¶¶8-11))—meaning that neither can pass on increased surcharges to their low-income ACP customers—indeed, they are obligated by a binding agreement with California to maintain existing prices.[9]

\*     \*     \*     \*     \*

In sum, Appellants are likely to succeed on appeal and, at a minimum, have presented a "substantial question" on the merits—therefore justifying a stay or injunction pending appeal. *Leiva-Perez*, 640 F.3d at 966; *see Azurin v. Von Raab*, 792 F.2d 914, 915 (9th Cir. 1986) (granting stay where movant "raise[d] a number of serious and complex legal questions," "[t]he issues presented on appeal [were] substantial and of public importance," and "[t]here [was] a clear public interest in their proper resolution").

---

[9] As part of a settlement of an unsuccessful antitrust challenge to the 2020 T-Mobile/Sprint merger, T-Mobile made a commitment to California to make available until April 2025 "the same or better smartphone consumer rate plans" that were offered in 2019 (*i.e.*, including tax-inclusive plans). *See* Settlement Agreement and Release of Claims at 2, https://oag.ca.gov/system/files/attachments/press-docs/CA%20Settlement%20Agreement%20%283.9%20fully%20executed%29.pdf The District Court overlooked this fact when incorrectly stating that Appellants "do not explain why" they "have to absorb" the increased surcharge costs for their tax-inclusive plans. Exhibit B at 17.

**B.  Appellants Will Suffer Irreparable Harm, As the District Court Found, While the CPUC and Third Parties Will Suffer No Harm.**

Even while denying Appellants relief, the District Court recognized that Appellants "did establish irreparable injury." Exhibit A at 6. The Court also acknowledged that "[t]he PUC did not challenge the financial, reputational, and competitive harm that the plaintiffs allegedly will suffer" from the connections-based rule. Exhibit B at 17.

The new rule is already inflicting severe, irreparable harms on Appellants—harms that are compounded every additional day that the new rule remains in effect. These include losses—which, the District Court recognized, Appellants have no path to recouping if they prevail[10]—of nearly ***$11 million per month***, as well as loss of business and customer goodwill. Exhibit B at 17; Exhibit D ¶¶22, 25. Appellants submitted unrefuted testimony that for their *tax-inclusive* plans, Appellants themselves will have to absorb the substantially increased surcharge burden under the new rule, given the "all in" nature of these plans. *Id.* And, given T-Mobile's pricing commitment to California, *see* note 9 *supra*, Appellants cannot shift the increased burden to their subscribers to these plans.

Subscribers to Appellants' *tax-exclusive* plans will feel the brunt of the substantial surcharge increases—collectively, millions of dollars more each

---

[10] *See* Exhibit B at 17 (noting CPUC's Eleventh Amendment immunity from damages actions and citing cases finding irreparable harm in such situations).

month—under the new rule. Many of these subscribers may be forced to cut off service entirely. Exhibit D ¶¶27, 29, 35. And numerous comments filed at the CPUC bore out those concerns. Dkt. 4-12 (comments, including from elderly individuals whose only income is Social Security benefits, that service would become unaffordable). *See, e.g.*, *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011). Worse still, Appellants will suffer irreparable harm to their brands, reputations, and hard-earned customer goodwill. Exhibit D ¶¶32-33.

In stark contrast with these unrefuted harms to Appellants and their customers, the CPUC will suffer *no harm* if its new surcharge rule is temporarily stayed pending appeal. The CPUC presented no evidence that a stay would cause any underfunding of its universal service programs. Dkt. 28 at 18-20. Instead, the CPUC stated it had hoped to "collect *more money* from the access-line surcharge[s]" and suggested a stay would impede that aspiration. Dkt. 45-1 ¶6 (emphasis added). But that does not establish a *shortfall* in funding or that universal service will be undermined. That is not surprising given the CPUC's conceded ability to adjust its surcharge rates as needed to maintain full and stable funding, as well as billions of dollars available in federal funding. *See supra* at 6.

At most, the CPUC claims (again, without any evidence) its revenues-based surcharge mechanism will become "unsustainable ***in the long term***." Dkt. 28 at 5 (emphasis added). But there is no plausible claim of any adverse financial impact ***in***

**the limited time it takes to resolve this appeal**, which will be fully briefed by June 20. The CPUC also complained it will have to update its website and revert to the revenues system it used just days ago (before April 1). Dkt. 45-1 ¶¶4-5. But the proper focus is on the status quo at the time this lawsuit commenced. *See Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) ("'Status quo ante litem' refers to 'the last uncontested status which preceded the pending controversy.'"); *In re EPA*, 803 F.3d 804, 806 (6th Cir. 2015) (staying rule that had already gone into effect and noting that "the status quo at issue is the pre-Rule regime … that has been in place for several years"), *vacated on other grounds*, 713 F. App'x 489 (6th Cir. 2018). Regardless, these asserted harms—which the CPUC made no attempt to even "estimate," Dkt. 45-1 ¶5—pale in comparison with the massive injuries to Appellants and their customers.

Nor did the CPUC submit any evidence that a stay would harm third parties. Instead, it speculated that carriers and consumers will be "confused" if a stay is issued. Dkt. 45 at 8. This professed concern rings hollow, given that individual consumers, consumer groups, and wireless carriers uniformly *opposed* the new rule. *See* Dkt. 4-6 to 4-12. The CPUC has not substantiated its counterintuitive suggestion that consumers and carriers would object to *not* paying or remitting higher surcharges for the duration of a stay.

## C. The Public Interest Decisively Supports a Stay.

Finally, a stay promotes the public interest. As the District Court acknowledged, "[p]articularly for customers on [Appellants'] tax-exclusive plans, the new surcharge will operate like a regressive tax and 'will be especially burdensome for low-income and marginalized communities and families with multi-line wireless plans.'" Exhibit B at 8. Civil rights *amici* likewise observed that the CPUC's rule "will make wireless service … less affordable and accessible to those who need it most" and "disproportionately hurt low-income individual[s] and communities of color" who heavily rely on wireless service as their only means of accessing the internet. Dkt. 23 at 3-4, 7.

Nevertheless, the Court accepted the CPUC's assertion that its new rule will best advance universal service. Exhibit B at 18. But, as explained above, the FCC is preeminent in setting universal service policy and it has held that a revenues-based mechanism is preferable to a connections-based mechanism for a host of reasons. "[T]he public interest favors applying federal law correctly." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011).

## CONCLUSION

The Court should grant (1) a stay or injunction pending appeal and (2) administrative stay pending adjudication of this Motion.

22

Date: April 10, 2023                    Respectfully submitted,

                                        DLA PIPER LLP (US)

                                        By:   */s/ Peter Karanjia*

                                        Peter Karanjia
                                        500 8th Street, NW
                                        Washington, DC 20004
                                        (202) 799-4135
                                        peter.karanjia@us.dlapiper.com

                                        Kathleen S. Kizer
                                        500 Mission Street, Suite 2400
                                        San Francisco, CA 94105
                                        (415) 836-2500
                                        kathy.kizer@us.dlapiper.com

                                        Ben C. Fabens-Lassen
                                        Gaspard Rappoport
                                        2000 Avenue of the Stars
                                        Suite 400, North Tower
                                        Los Angeles, CA 90067
                                        (310) 595-3000
                                        ben.fabens-lassen@us.dlapiper.com
                                        gaspard.rappoport@us.dlapiper.com

                                        Attorneys for Appellants-Plaintiffs

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This motion conforms to type-volume limitations provided in Fed. R. App. P. Rule 27(d)(2)(A) because it contains 5,198 words.

2.      This motion complies with the typeface requirements of in Fed. R. App. P. Rules 27(d)(1)(E) and 32(a)(5) and Ninth Circuit Rule 32(b), and the type-style requirements of in Fed. R. App. P. Rule 32(a)(6), because it was prepared using Microsoft Word 2016 and is written in 14-point, proportionately spaced Times New Roman font.

Date:  April 10, 2023                    */s/ Peter Karanjia*

*Counsel for Appellants-Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 10, 2023, I served all counsel of record with a copy of this Motion via ECF and email. Service by email was sent to the below-listed counsel for Appellees at the following email addresses:

Counsel: David W. Fermino, Jonathan Koltz, Ian Culver, and Vanessa Baldwin

Emails: david.fermino@cpuc.ca.gov, ian.culver@cpuc.ca.gov, vanessa.young@cpuc.ca.gov,

Date: April 10, 2023                    */s/ Peter Karanjia*

                                        *Counsel for Appellants-Plaintiffs*

25