No. 23-15490

# In the United States Court of Appeals for the Ninth Circuit

ASSURANCE WIRELESS USA, L.P.; METROPCS CALIFORNIA, LLC; SPRINT SPECTRUM LLC; T-MOBILE USA, INC.; and T-MOBILE WEST LLC,

*Plaintiffs-Appellants,*

v.

ALICE B. REYNOLDS, *President of the California Public Utilities Commission, in her official capacity*; KAREN DOUGLAS, *Commissioner of the California Public Utilities Commission, in her official capacity*; DARCIE L. HOUCK, *Commissioner of the California Public Utilities Commission, in her official capacity*; JOHN REYNOLDS, *Commissioner of the California Public Utilities Commission, in his official capacity*; and GENEVIEVE SHIROMA, *Commissioner of the California Public Utilities Commission, in her official capacity*,

*Defendants-Appellees,*

_____

On Appeal from the United States District Court
for the Northern District of California, San Francisco Division
Case No. No. 3:23-cv-00483-LB, Magistrate Judge Laurel Beeler

## REPLY BRIEF OF APPELLANTS

Kathleen S. Kizer
DLA PIPER LLP (US)
555 Mission Street, #2400
San Francisco, CA 94105

Ben C. Fabens-Lassen
Gaspard Rappoport
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067

Peter Karanjia
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
(202) 799-4135
peter.karanjia@dlapiper.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

ARGUMENT ........................................................................................1

THE DISTRICT COURT ERRED BY DENYING A PRELIMINARY INJUNCTION ..................1

    A.    Appellants Are Likely to Succeed on the Merits. ..................1

        1.    The CPUC's Rule Is "Inconsistent With" FCC Rules and thus Expressly Preempted by Section 254(f). ....................1

            a.    The CPUC's New Argument Invoking the "Structure" and "Purpose" of the Communications Act Fails.............2

            b.    The CPUC Misstates the FCC's Positions and Relies on Inapposite Cases. ..........................................7

            c.    The CPUC Misapplies Preemption Principles. ..............12

            d.    The CPUC's Slippery-Slope Argument Is Baseless.......15

        2.    The CPUC's Rule Is Not Competitively Neutral. ...................18

            a.    The CPUC's Rule Discriminates Against Assurance Wireless and MetroPCS as ACP Providers. ..................18

            b.    The CPUC's Rule Discriminates Against Appellants as Compared to Local Exchange Carriers. .....................21

    B.    The CPUC Cannot Rewrite the District Court's Unequivocal Finding that Appellants Established Irreparable Harm......................23

    C.    The CPUC Will Not Suffer Any Harm from a Preliminary Injunction, which Will Further the Public Interest. ...........................25

CONCLUSION ....................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amylin Pharms., Inc. v. Eli Lilly & Co.*,
456 F. App'x 676 (9th Cir. 2011) ........................................................27

*Ariz. Dream Act Coal. v. Brewer*,
855 F.3d 957 (9th Cir. 2017) .............................................................26

*AT&T Commc'ns, Inc. v. Eachus*,
174 F. Supp. 2d 1119 (D. Or. 2001) ....................................................3

*Boise Cascade Corp. v. EPA*,
942 F.2d 1427 (9th Cir. 1991) ...........................................................11

*In re Burns*,
974 F.2d 1064 (9th Cir. 1992) ........................................................3, 5

*Cal. Rest. Ass'n v. City of Berkeley*,
65 F.4th 1045 (9th Cir. 2023) .......................................................13, 14

*California v. FCC*,
75 F.3d 1350 (9th Cir. 1996) ..............................................................6

*Chae v. SLM Corp.*,
593 F.3d 936 (9th Cir. 2010) .............................................................13

*Consumers' Rsch. v. FCC*,
67 F.4th 773 (6th Cir. 2023) ...............................................................5

*Ecological Rts. Found. v. PG&E Co.*,
874 F.3d 1083 (9th Cir. 2017) .........................................................2, 7

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000) ..........................................................................14

*Glob. Horizons, Inc. v. DOL*,
510 F.3d 1054 (9th Cir. 2007) .......................................................24, 25

*Lopez v. Heckler*,
713 F.2d 1432 (9th Cir. 1983) ...........................................................27

*Louisiana Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)........................................................................6

*In re Mercury Interactive Corp. Sec. Litig.*,
   618 F.3d 988 (9th Cir. 2010) ..............................................3, 13, 19

*MetroPCS Cal., LLC v. Picker*,
   970 F.3d 1106 (9th Cir. 2020) ..................................................19, 20

*Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.*,
   423 F.3d 1056 (9th Cir. 2005) ..................................................2, 11, 15

*Mozilla Corp. v. FCC*,
   940 F.3d 1 (D.C. Cir. 2019)..............................................................8

*N.D. v. State of Hawaii Dep't of Educ.*,
   600 F.3d 1104 (9th Cir. 2010) .......................................................27

*Oakland Trib., Inc. v. Chron. Publ'g Co.*,
   762 F.2d 1374 (9th Cir. 1985) .......................................................24

*Olympic Pipe Line Co. v. City of Seattle*,
   437 F.3d 872 (9th Cir. 2006) .........................................................11

*U.S. Telecom Ass'n v. FCC*,
   825 F.3d 674 (D.C. Cir. 2016).........................................................8

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
   579 U.S. 115 (2016).......................................................................13

*R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*,
   29 F.4th 542 (9th Cir. 2022) .........................................................13

*Sports Form, Inc. v. United Press Int'l, Inc.*,
   686 F.2d 750 (9th Cir. 1982) .........................................................25

*Tex. Off. of Pub. Util. Couns. v. FCC*,
   183 F.3d 393 (5th Cir. 1999) .......................................................4, 5

*The Util. Reform Network v. CPUC*,
   26 F. Supp. 2d 1208 (N.D. Cal. 1997)........................................11, 12

*Yokoyama v. Midland Nat. Life Ins. Co.*,
   594 F.3d 1087 (9th Cir. 2010) .......................................................23

## Statutes & Rules

47 U.S.C. § 152 ................................................................................4

47 U.S.C. § 225 ..............................................................................16

47 U.S.C. § 254(f) ....................................................................*passim*

47 U.S.C. § 276(c) ..........................................................................11

Ill. Comp. Stat. 5/13-703(c) ...........................................................16

Iowa Code § 477C.3 ........................................................................16

Iowa Code § 477C.7 ........................................................................16

Minn. Stat § 237.52 .........................................................................16

Miss. Code Ann. § 77-3-505 ............................................................16

Miss. Code Ann. § 77-3-507 ............................................................16

N.C. Gen. Stat. § 62-157 .................................................................16

N.D. Cent. Code § 54-44.8-03 .........................................................16

N.D. Cent. Code § 54-44.8-08 .........................................................16

N.H. Code Admin. R. Ann. PUC 404.09 .........................................16

N.M. Admin. Code 17.11.10.7(A) ...................................................17

Ohio Admin. Code 4901:1-6-36 ......................................................16

Ohio Rev. Code Ann. § 4905.8 ........................................................16

S.D. Codified Laws § 49-31-51 .......................................................16

S.D. Admin. R. 20:10:32:10 ............................................................16

Utah Admin. Code R746-8-301(1)(e)(ii) .....................................16, 17

Fed. R. App. P. 10(a) ......................................................................27

**Administrative Decisions & Regulations**

*Fed.-State Joint Bd. on Universal Serv.*,
   12 FCC Rcd. 8776 (1997)...................................................5, 10, 12, 19

*Fed.-State Joint Bd. on Universal Serv.*,
   15 FCC Rcd. 20769 (1999)..........................................................9, 10

*Fed.-State Joint Bd. on Universal Serv.*,
   15 FCC Rcd. 15168 (2000)...............................................................22

*Fed.-State Joint Bd. on Universal Serv.*,
   16 FCC Rcd. 9892 (2001)...........................................................9, 10

*In re Dual Party Relay Serv. Monthly Maint. Surcharge*,
   No. 1990-UA-156 (Miss. Pub. Serv. Comm'n Oct. 5, 2017)...........................16

*Notice of Proposed Amends. to the Ariz. Universal Serv. Fund*,
   No. 78817, 2022 WL 17902753 (Ariz. Corp. Comm. Dec. 15, 2022)...............17

*Protecting & Promoting the Open Internet*,
   30 FCC Rcd. 5601 (2015)....................................................................7

*Rep. on the Future of the Universal Serv. Fund*,
   2022 WL 3500217 (FCC Aug. 15, 2022)....................................................19, 20

*Restoring Internet Freedom*,
   33 FCC Rcd. 311 (2018)......................................................................8

*Universal Serv. Contribution Methodology*,
   27 FCC Rcd. 5357 (2012)...................................................................9

47 C.F.R. § 54.706 ..............................................................................18

47 C.F.R. § 54.709(a)........................................................................2, 4, 5, 10

47 C.F.R. § 64.604(c)(5)(iii)...............................................................16

**Other Authorities**

Sherry Lichtenberg, National Regulatory Research Institute, *State Universal Service Funds 2018: Updating the Numbers* (April 2019), *available at*: https://pubs.naruc.org/pub/3EA33142-00AE-EBB0-0F97-C5B0A24F755A ............................................................15, 16, 18

Assurance Wireless, Affordable Connectivity Program (last visited June 20, 2023), https://www.assurancewireless.com/acp/affordable-connectivity-program .....................................................................................................................20

Metro by T-Mobile, Affordable Connectivity Program (last visited June 20, 2023), https://www.metrobyt-mobile.com/benefits/affordable-connectivity-program..........................................................................................20

# INTRODUCTION

In their opening brief, Appellants demonstrated that: (i) the CPUC's new connections-based rule is preempted by Section 254(f) of the Communications Act for three independent reasons, and (ii) the district court committed several errors of law—and thus abused its discretion—when it denied Appellants' request to preliminarily enjoin the CPUC's rule. In response, the CPUC ignores the statutory text, renders Section 254(f)'s "not inconsistent with" express preemption clause meaningless, misrepresents the FCC's authoritative interpretations of the statute, and compounds the district court's interpretive errors.

As to the equities, the CPUC doubles down on its disregard for the severe inequitable impacts of its surcharge overhaul, while at the same time attempting to rewrite the district court's unequivocal finding that Appellants would suffer irreparable harm. The CPUC's rule is unlawful, inequitable, and should be preliminarily enjoined.

# ARGUMENT

## THE DISTRICT COURT ERRED BY DENYING A PRELIMINARY INJUNCTION

### A. Appellants Are Likely to Succeed on the Merits.

#### 1. The CPUC's Rule Is "Inconsistent With" FCC Rules and thus Expressly Preempted by Section 254(f).

Section 254(f) provides that "[a] State may adopt regulations *not inconsistent with* the [FCC's] rules to preserve and advance universal service." 47 U.S.C.

§ 254(f) (emphasis added). Appellants demonstrated that they are likely to succeed on the merits of their claim that the CPUC's new *connections-based* rule is expressly preempted by Section 254(f) because the rule is "inconsistent with" the FCC's universal service rule requiring providers to use a *revenues-based* contribution mechanism. Opening Br. 30–42; *see* 47 C.F.R. § 54.709(a), (a)(3). The CPUC's rule is "incongruous" and "inharmonious" with the FCC's rule, and therefore "inconsistent with" it. *Ecological Rts. Found. v. PG&E Co.*, 874 F.3d 1083, 1095 (9th Cir. 2017). That is because, unlike the FCC's rule, the CPUC's rule (i) rejects a revenues-based mechanism to determine the fundamental question of how to calculate universal service assessments, and (ii) assesses surcharges without regard to whether the underlying services are surchargeable. The CPUC's new rule thus "interferes with the methods by which the federal [regulatory scheme] was designed to reach its goal,'" and is preempted. *See Metrophones Telecomms., Inc. v. Glob. Crossing Telecomms., Inc.*, 423 F.3d 1056, 1073 (9th Cir. 2005), *aff'd*, 550 U.S. 45 (2007). That conclusion follows from the statutory text and the FCC's authoritative interpretations of Section 254(f). The CPUC's contrary arguments cannot withstand scrutiny.

### a. The CPUC's New Argument Invoking the "Structure" and "Purpose" of the Communications Act Fails.

Seeking to overcome the facial inconsistency between its rule and the FCC's counterpart rule, the CPUC purports to rely on the "structure" and "purpose" of the Communications Act. *See* CPUC Br. 21, 37–39. Specifically, the CPUC suggests

2

(at 37-38) that there can be no preemption under Section 254(f)'s "not inconsistent with" clause because the CPUC has plenary authority over surcharge assessments on *intrastate* services while the FCC has no authority in this area.

This newfound argument was never presented to the district court (*see* SER-16–43) and is therefore "deemed waived on appeal." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010). But even if the new argument were considered, it is fundamentally misguided.

*First*, the argument would render the "not inconsistent with" clause meaningless—contrary to cardinal canons of statutory interpretation. *See, e.g.*, *In re Burns*, 974 F.2d 1064, 1066 (9th Cir. 1992) (rejecting interpretation that would render statutory language "meaningless" and explaining that "[w]e 'avoid any statutory interpretation that renders any section superfluous and does not give effect to all of the words used by Congress.'") (citation omitted).

In Section 254(f), Congress explicitly granted state PUCs authority to adopt universal service rules but cabined that authority in several ways, including by prohibiting them from adopting rules that are "inconsistent with" the FCC's rules to preserve and advance universal service. 47 U.S.C. § 254(f); *see* Opening Br. 9–12, 33-36. This express preemption clause "constrains state regulation by prohibiting regulations inconsistent with FCC rules to preserve and advance universal service." *AT&T Commc'ns, Inc. v. Eachus*, 174 F. Supp. 2d 1119, 1123 (D. Or. 2001). Thus,

so long as the FCC has adopted a rule to preserve and advance universal service—as it has done here, *see* 47 C.F.R. § 54.709(a), (a)(3)—the plain text of the statute expressly preempts any state PUC rule that is "inconsistent with" that federal rule. If, as the CPUC incorrectly suggests, the FCC's policy decisions regarding universal service could have no impact on *state* universal service rules, Section 254(f)'s "not inconsistent with" clause would be superfluous. Under the CPUC's flawed logic, state PUCs could always avoid preemption simply by asserting that they are establishing their own state (rather than federal) universal service programs. That is not—and cannot be—the law.[1]

*Second*, the CPUC's argument ignores the FCC's primacy in universal service regulation. If Congress had merely intended to recognize the FCC's authority over interstate telecommunications services and the authority of state PUCs over intrastate services—as the CPUC suggests (at 37–38)—there would have been no need to say anything beyond what is already stated in 47 U.S.C. § 152, which codifies that division of authority. But Congress went further and added Section 254(f), including the explicit requirement that any state universal service rules be "not

---

[1] *TOPUC* does not support the CPUC's position. *See* CPUC Br. 38-39 (citing *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 424 (5th Cir. 1999) ("*TOPUC*")). As the CPUC acknowledges, the state rule there "dictate[d] the circumstances under which *local service* must be maintained." *Id.* (emphasis added). Because, unlike here, *TOPUC* addressed a state rule regulating *only* "local service"—*i.e.*, it did not regulate any interstate service—the court's discussion of the limitations on the FCC's authority over such purely intrastate matters is inapposite here.

inconsistent with" the FCC's rules to preserve and advance universal service. That requirement must be given effect. *See Burns*, 974 F.2d at 1066.

Congress also could have provided that *the FCC* shall have no authority to adopt universal service rules "inconsistent with" state PUC rules, but it did the opposite instead. Thus, contrary to the CPUC's newfound theory, the statutory text, purpose, and structure manifest Congress's intent to afford the FCC—not state PUCs—the primary role in setting national universal service policy. As the Sixth Circuit recently explained, "[i]t is the FCC that implements congressional mandates regarding which services are included in the [Universal Service Fund], which types of entities provide interstate telecommunications, and the means of calculating each carrier's contribution amount." *Consumers' Rsch. v. FCC*, 67 F.4th 773, 796 (6th Cir. 2023) (citing 47 C.F.R. § 54.709(a)). "[S]ection 254 demonstrates that the [FCC] ultimately is responsible for ensuring sufficient [universal service] support mechanisms." *Fed.-State Joint Bd. on Universal Serv.*, 12 FCC Rcd. 8776, 9194–95, ¶ 818 (1997) ("*1997 FCC Order*"), *aff'd in part, rev'd in part, and remanded in part on other grounds*, *TOPUC*, 183 F.3d 393. Yet the CPUC and the district court would flip the statutory regime on its head and subordinate the FCC's authority over universal service policymaking to that of all fifty state PUCs. This is not "cooperative federalism" (CPUC Br. 1, 10–11, 27); it is an unlawful attempt by the CPUC to

override the FCC's policy determination regarding the type of surcharge mechanism that best advances universal service.

*Third*, even apart from Section 254(f)'s "not inconsistent with" express preemption clause, the CPUC's argument rests on a misunderstanding of the FCC's authority. On its face, the CPUC's connections-based rule applies regardless of whether the regulated carriers are providing intrastate or interstate services. (*See* 2-ER-103–104.) And the district court recognized that Appellants (like other carriers subject to the rule) provide both interstate and intrastate services. (1-ER-7; *see also* 2-ER-62.) Where, as here, the services regulated are jurisdictionally mixed—*i.e.*, involve both interstate and intrastate elements—it is well-established that the FCC has jurisdiction to regulate both the interstate and intrastate portions of the services. *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 n.4 (1986); *California v. FCC*, 75 F.3d 1350, 1360-61 (9th Cir. 1996). The CPUC's assumption that the FCC would lack statutory authority to expressly preempt the CPUC's rule therefore flies in the face of blackletter law.

Ultimately, the CPUC fails to come to grips with the plain meaning of Section 254(f)'s express preemption of state PUC rules that are "inconsistent with" FCC rules to preserve and advance universal service. The CPUC vaguely alludes to "definitional possibilities" (at 31), but never disputes the relevance of the dictionary definitions that this Court has applied to interpret the same statutory language. *See*

Opening Br. 31–32 (citing *Ecological Rts. Found.*, 874 F.3d at 1095); CPUC Br. 30–31. And—like the district court—the CPUC's brief leaves a simple but crucial question unanswered: If the CPUC's new rule (which is based on connections and is indifferent to the nature of the services provided) is not "inconsistent with" the FCC's rule (which is based on revenues and places prime importance on the surchargeable nature of the services provided), what sort of state PUC rule ever *would be preempted* by Section 254(f) as "inconsistent with" an FCC rule? The reason for this silence is obvious: The interpretation of Section 254(f) proposed by the district court and CPUC renders that provision's express preemption clause entirely meaningless, in violation of cardinal principles of statutory interpretation.

### b. The CPUC Misstates the FCC's Positions and Relies on Inapposite Cases.

Recent FCC decisions confirm that Section 254(f) expressly preempts state universal service rules that, as here, materially diverge from the FCC's rules to preserve and advance universal service. Opening Br. 33–34. In particular, the FCC's *Open Internet Order* recognized that where the FCC has adopted a rule to preserve and advance universal service, any counterpart state universal service rule must align with the FCC rule; otherwise the state rule "would be inconsistent with federal policy and therefore … preempted by section 254(f)." *Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601, 5837 n.1477 (2015) ("*Open Internet Order*"), *pets. for*

*rev. denied*, *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016).[2]  The CPUC, however, ignores that holding and buries the FCC's *Restoring Internet Freedom Order*—which reaffirmed the same principle, *see* 33 FCC Rcd. 311, 429 n.736 (2018)— in a footnote to its brief that focuses on an irrelevant aspect of that order.[3]  The CPUC does not dispute that the FCC's interpretations of Section 254(f) are reasonable and entitled to *Chevron* deference.  *See* CPUC Br. 31; Opening Br. 33–34.

Further, the FCC has long concluded that a revenues-based methodology best advances universal service, while repeatedly declining to adopt a divergent, connections-based methodology.  Opening Br. 12–14.  But in an attempt at revisionist history, the CPUC seeks to portray the FCC as supposedly well-disposed to a connections-based approach.  While the FCC has acknowledged commenters' *arguments* for transitioning to a connections-based approach, it has repeatedly declined to make that transition.  In 2012, for example, the FCC acknowledged arguments by

---

[2] As Appellants explained, to trigger preemption, there must be a material difference between the state PUC rule and an FCC rule *to preserve and advance universal service*.  *See* Opening Br. 38.  Thus, the CPUC attacks a straw man when it caricatures Appellants' argument as maintaining that state PUC rules must be "identical to" or a "carbon copy" of any FCC rule.  *See* CPUC Br. 4, 29, 37.

[3] The CPUC stresses that the D.C. Circuit vacated a different portion of the *Restoring Internet Freedom Order*, which had sought to preempt state net neutrality laws.  *See* CPUC Br. n.10 (citing *Mozilla Corp. v. FCC*, 940 F.3d 1, 74 (D.C. Cir. 2019)).  But the D.C. Circuit's vacatur of the FCC's attempted preemption of state net neutrality laws has no bearing on its reaffirmation of the principle—established years earlier in the *Open Internet Order*—that state universal service rules must align with FCC rules to preserve and advance universal service.

"[p]roponents of connections-based methodologies," but also pointed to concerns that "a connections-based system may be at least as complex to implement and administer as a revenue-based system, with many operational details that would need to be resolved." *Universal Serv. Contribution Methodology*, 27 FCC Rcd. 5357, 5437, ¶ 222 (2012) ("*2012 FCC Notice*"). In particular, the FCC highlighted the lack of a "universally-recognized … definition of 'connection'"—likewise a subject of controversy in the present CPUC proceeding. *Id.* at 5439–43, ¶¶ 226–244. And the FCC cited commenters' concerns that "assessing a flat universal service charge (such as a telephone-number based charge) is inherently unfair because it does not take into account the fact that some people make many interstate and international calls, while others make few calls in a given month, yet all users (heavy users or light users) would be subject to the same flat monthly assessment amount." *Id.* at 5457–58, ¶ 287; *see also Fed.-State Joint Bd. on Universal Serv.*, 16 FCC Rcd. 9892, 9906, ¶ 29 (2001) ("*2001 FCC Notice*") (seeking comment on "disadvantages" of a connections-based rule, including that it "would not be usage based" and, as a result, may "shift a disproportionate share of the carrier's universal service contributions to certain customers or classes of customers, such as low-volume users.").

Still to this day, the FCC has not shifted to a connections-based rule. It has never repudiated its finding that a revenues-based approach is competitively neutral, easily administrable, and avoids economic distortions. *See Fed.-State Joint Bd. on*

*Universal Serv.*, 15 FCC Rcd. 20769, 20772, ¶ 5 (1999); *1997 FCC Order*, 12 FCC Rcd. at 9206–07, ¶¶ 844–45.  Nor has the FCC made a similar finding with respect to a connections-based approach.  To the contrary, "[t]he [FCC] expressed concern that a non-revenues-based approach may not be competitively neutral because it may inadvertently favor certain services or providers over others." *2001 FCC Notice*, 16 FCC Rcd. at 9906, ¶ 29.  Its longstanding revenues-based rule still stands.  *See* 47 C.F.R. § 54.709(a), (a)(1), (a)(3).[4]

The CPUC also wrongly suggests its new connections-based rule is saved from preemption by the FCC's observation that the Communications Act does not, by its own terms, "require[] contributions to be based on revenues."  CPUC Br. 13-14 (citing *2012 FCC Notice*, ¶ 219).  That is irrelevant.  True, the statute affords *the FCC* discretion to determine which contribution mechanism—in its expert judgment—best preserves and advances universal service, and it does not mandate the FCC adopt a revenue-based mechanism.  But the FCC has already determined that a revenues-based mechanism furthers that objective better than a connections-based one, and that determination binds the CPUC under Section 254(f)'s "not inconsistent with" clause.

---

[4] The CPUC quotes a portion of the *2012 Notice* addressing how carriers may *apportion* their revenues between surchargeable and nonsurchargeable services. *See* CPUC Br. 36.  In addressing that distinct issue, however, the FCC did not suggest it no longer believes its revenues-approach better advances universal service than a connections-based approach.

The CPUC repeatedly argues (at 28–37) that no court has previously interpreted that clause in the manner proposed by Appellants. But the CPUC ignores this Court's *Metrophones* decision, which interpreted identical language in another provision of the Communications Act in a consistent way. *See* Opening Br. 40–41 (discussing *Metrophones*, 423 F.3d at 1076-1079 (interpreting 47 U.S.C. § 276(c), which preempts state laws that are "inconsistent with the [FCC's payphone] regulations," to prohibit divergent state rules)); *see also Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991) ("We must presume that words used more than once in the same statute have the same meaning") (citation omitted). Nor is the absence of a judicial precedent squarely on point a reason to reject Appellants' argument. "To determine whether the [statute] preempts [the CPUC's] action, we begin with the statutory text." *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877 (9th Cir. 2006). And, as discussed, the ordinary meaning of the statutory text makes clear that the CPUC's connections-based rule is inconsistent with the FCC's revenues-based rule.

Like the district court (*see* 1-ER-14–15), the CPUC relies on a 25-year-old trial court decision that rejected a preemption challenge to the CPUC's prior *revenues-based* surcharge regime. *See* CPUC Br. 32–33 (citing *The Util. Reform Network v. CPUC*, 26 F. Supp. 2d 1208 (N.D. Cal. 1997) ("*TURN*")). But *TURN* is inapposite. The FCC order that the *TURN* court analyzed to determine whether there

11

was any actionable inconsistency expressly allowed carriers to pass through their federal universal service fees to customers—the same result as the CPUC's end-user surcharge. *See 1997 FCC Order*, 12 FCC Rcd. at 9211, ¶¶ 853–55; *TURN*, 26 F. Supp. 2d at 1214–15; *see also 2012 FCC Notice*, 27 FCC Rcd. at 5362–63, ¶ 9 (carriers "commonly recover their [federal] universal service contribution costs from their customers"). Accordingly, the relevant rules in *TURN* were *consistent*, whereas the CPUC's rule here is clearly inconsistent with the FCC's rule.

The CPUC next seeks refuge in the *TURN* court's statement that the bill enacting Section 254(f) "did not 'presume that any particular existing mechanism for universal service support must be maintained or discontinued.'" CPUC Br. 33 (quoting *TURN*, 26 F. Supp. 2d at 1215). This argument is no more persuasive than the CPUC's misplaced reliance on the *2012 FCC Notice*. *See supra* at 10. The point is not that the statute itself categorically prohibits or prescribes a particular methodology, but rather that it simply requires *consistency with* the methodology that the FCC has already determined best preserves and advances universal service. The CPUC must respect that policy decision.

### c. The CPUC Misapplies Preemption Principles.

Compounding its flawed statutory interpretation, the CPUC misapplies basic principles of preemption law.

*First*, seeking to "borrow from the principles of conflict preemption," the CPUC asserts the new argument on appeal that the Court should apply a "presumption against preemption." CPUC Br. 27, 31. As an initial matter, because this argument was never presented below, it is not properly before this Court. *Mercury*, 618 F.3d at 992.

Regardless, the argument is flawed. Express preemption—at issue here—is different from conflict preemption. *See Chae v. SLM Corp.*, 593 F.3d 936, 941–43 (9th Cir. 2010) (discussing different legal standards governing express and conflict preemption). And there is no need for Appellants to "show[] that it is literally impossible to comply with both" the FCC rule and the CPUC rule, as the CPUC suggests (Br. 31), because Appellants are not relying on impossibility preemption—a distinct doctrine.

The CPUC's newfound reliance on the "presumption against preemption" is also inconsistent with controlling Supreme Court and Ninth Circuit precedent. As this Court has squarely held, "if a 'statute contains an express pre-emption clause, *we do not invoke any presumption against pre-emption* but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *R.J. Reynolds Tobacco Co. v. Cnty. of L.A.*, 29 F.4th 542, 553 n.6 (9th Cir. 2022) (emphasis added) (quoting *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016)); *see Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th

13

1045, 1050 (9th Cir. 2023) (explaining that courts apply the "textual" express preemption analysis "without any presumptive thumb on the scale for or against preemption").

*Second*, the CPUC argues (at 33) that the FCC has not expressly "foreclosed states from using" a connections-based rule, but this too is irrelevant. The Supreme Court "has never before required a specific, formal agency statement identifying conflict in order to conclude that such a conflict in fact exists." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884 (2000). And Section 254(f)'s language expressly preempting inconsistent state rules would be unnecessary and superfluous if, as the CPUC incorrectly suggests, the onus fell on the FCC to police the universal service regimes of all fifty States. Moreover, the CPUC has not identified any petition asking the FCC to preempt a connection-based universal service rule.

Finally, even if conflict preemption principles applied (rather than the plain text of Section 254(f)'s "not inconsistent with" clause), Appellants have shown those principles likewise establish preemption here. *See* Opening Br. 38–39. The CPUC incorrectly argues (at 31) that Appellants "have never established that California's rule conflicts with the FCC's in some material way." For one, the CPUC's rule not only determines the fundamental question of how to calculate universal service fees (with multi-million-dollar consequences), but also it does so in a manner that is diametrically opposed to the FCC's approach to the same issue. Moreover, while the

14

FCC's approach to assessing surcharges has always been tethered to whether the underlying services are surchargeable, the CPUC's rule assesses surcharges without regard to whether the underlying services are surchargeable—for example, the CPUC's rule does not distinguish surchargeable intrastate voice service from non-surchargeable broadband. *See* Opening Br. 12, 16. Indeed, an explicit goal of the CPUC was to reject the FCC's approach to universal service. *See id.* at 41 (citing 2-ER-64). The CPUC's rule thus "interferes with the methods by which the federal [regulatory scheme] was designed to reach its goal" and is accordingly preempted. *Metrophones*, 423 F.3d at 1073.

### d. The CPUC's Slippery-Slope Argument Is Baseless.

Lacking any support for its position in the statutory text, the CPUC posits (at 40) that accepting Appellants' arguments would create havoc in universal service regulation and allegedly "call into question virtually every state's universal service rules." There is no basis for this purported concern.

The CPUC relies on a report that summarizes connections-based rules in other States based on 2018 data.[5] But even this report acknowledges that the vast majority of States that have adopted such rules apply them to Telecommunications Relay

---

[5] *See* CPUC Br. 16 (citing Sherry Lichtenberg, National Regulatory Research Institute, State Universal Service Funds 2018: Updating the Numbers (April 2019)) ("Lichtenbeg Report"), *available at* https://pubs.naruc.org/pub/3EA33142-00AE-EBB0-0F97-C5B0A24F755A.

Service ("TRS").[6]  Those States' rules are irrelevant, however, because TRS is *not*

*a universal service program* and is governed by a different statutory provision (Sec-

tion 225 of the Communications Act, not Section 254).[7]  As a result, TRS is *not*

subject to Section's 254(f)'s explicit limitations on state universal service programs,

and this Court's interpretation of the "inconsistent with" provision of Section 254(f)

has no bearing on numerous States' TRS rules.

Perhaps realizing this, the CPUC points to only three States with connections-

based rules for universal service programs that it claims are at risk of "endless liti-

gation" under Appellants' arguments.  CPUC Br. 13-14, 40 (discussing Utah, Ne-

braska, and New Mexico).  But that contention is greatly overstated, as these States'

rules differ from the CPUC's contested rule in important respects:

> ▪ **Utah** exempts certain providers of prepaid wireless service, *see* Utah
>   Admin. Code R746-8-301(1)(e)(ii), and imposes no surcharges if the
>   provider is subject to universal service assessments in other states or is
>   not providing intrastate telecommunications service, *see id.*, R746-8-

---

[6] *See* Licthenberg Report 28 ("[S]tates with TRS funds generally assess providers on a per line basis"); *see also* 220 Ill. Comp. Stat. 5/13-703(c); Iowa Code §§ 477C.3, 477C.7; Minn. Stat § 237.52; Miss. Code Ann. §§ 77-3-505, 507; *In re Dual Party Relay Serv. Monthly Maint. Surcharge*, No. 1990-UA-156 (Miss. Pub. Serv. Comm'n Oct. 5, 2017); N.C. Gen. Stat. § 62-157; N.D. Cent. Code §§ 54-44.8-03, 8-08; N.H. Code Admin. R. Ann. PUC 404.09; Ohio Rev. Code Ann. § 4905.8; Ohio Admin. Code 4901:1-6-36; S.D. Codified Laws § 49-31-51; S.D. Admin. R. 20:10:32:10; W. Va. Code R. §§ 150-21-1 to -13.

[7] *See* 47 U.S.C. § 225.  The TRS Fund is also distinct from the federal Universal Service Fund.  *See* 47 C.F.R. § 64.604(c)(5)(iii).  The CPUC's confusion may be attributable to the fact that the Lichtenberg Report "uses the term State USF … to refer to all" state funds, including state TRS funds.  Lichtenberg Report 2.

16

301(3)(a). By contrast, the CPUC rule applies regardless of the type of provider, the services provided, or how much of any given service the customer uses.

- ▪ *Nebraska* has adopted a "hybrid" approach—*i.e.*, (i) a *connections-based* mechanism for some communications services, and (ii) a *revenues-based* mechanism for others. *See* Decision No. NUSF-119/PI-233, 2021 WL 1987277, at *27 (NE Pub. Serv. Comm'n May 11, 2021) (concluding that "certain services do not lend themselves to a connections-based assessment mechanism" and therefore "should remain on a revenues-based assessment mechanism"). The CPUC here rejected a hybrid approach. (*See* 2-ER-62–63.)

- ▪ *New Mexico* defines "access line" differently than the CPUC by, among other things, exempting certain business lines. *Compare* N.M. Admin. Code 17.11.10.7(A), *with* 2-ER-81, 2-ER-94 (CPUC Decision).[8]

Finally, the CPUC asserts (at 15) that "most states manage their universal service funds differently than does the FCC," but—in stark contrast with this case—the CPUC points to meaningful divergence from FCC rules "*to preserve and advance universal service*." 47 U.S.C. § 254(f) (emphasis added). Even the report cited by the CPUC acknowledges that "[t]he majority of states assess all providers of

---

[8] The CPUC also emphasizes (at 13–14) that "Arizona has partly funded its program through an access-line surcharge since 1989." But, like Nebraska, Arizona adopts a hybrid approach, with (i) a flat-rate surcharge of approximately $0.20 for certain service providers, and (ii) a revenues-based approach for other providers. *See* A.A.C. R14-2-A1204(B); *Notice of Proposed Amends. to the Ariz. Universal Serv. Fund*, No. 78817, 2022 WL 17902753, at *1-2 (Ariz. Corp. Comm. Dec. 15, 2022). The CPUC's reliance on Washington State is puzzling. *See* CPUC Br. 14. As the CPUC acknowledges, Washington does not require either carriers or their customers to pay any surcharges under a connections-based mechanism; rather, it relies on financing from its *general fund*. *Id.* The CPUC explicitly rejected that approach here. (*See* 2-ER-63.)

intrastate telecommunications services, using FCC . . . data, regardless of the type of company or the technology they use." Lichtenberg Report, Executive Summary at 2. This mirrors the FCC's approach. *See* 47 C.F.R. § 54.706.

At bottom, there is no merit to the CPUC's alarmist and speculative contention that state universal service regulation will be upended if the Court accepts Appellants' argument. Indeed, it is telling that none of the States whose rules are ostensibly in jeopardy under Appellants' arguments have sought to intervene or appear as *amici* in support of the CPUC in this case.

### 2. The CPUC's Rule Is Not Competitively Neutral.

As Appellants showed, the CPUC's connections-based rule is also preempted for the independent reasons that it is neither competitively neutral nor nondiscriminatory—as required by federal law. Opening Br. 42–48.

#### a. The CPUC's Rule Discriminates Against Assurance Wireless and MetroPCS as ACP Providers.

As explained, the CPUC's rule discriminates against Appellants Assurance Wireless and MetroPCS as ACP providers. *Id.* at 43–45. That is because carriers who serve low-income participants in the California "LifeLine" program—which similarly subsidizes communications services for qualified, low-income consumers—are exempt from the CPUC's new surcharge. (2-ER-103.) But Assurance and MetroPCS—as providers of the same services to the same constituency of low-income individuals who receive ACP support—were denied an exemption.

The CPUC has no persuasive answer to this textbook competitive-neutrality violation. It argues (at 42) that "the Commission expressly crafted a surcharge mechanism" whereby "all will be treated equally." But that is not the case for Assurance and MetroPCS, who were denied an exemption granted to LifeLine providers. The CPUC does not defend its disparate treatment of these carriers based on any of the grounds asserted by the district court. Instead, it once again asserts new arguments—not raised below—that the programs are different, and that Appellants could avoid the impact of this discrimination by instead serving as LifeLine providers. These new arguments are forfeited, *see Mercury*, 618 F.3d at 992, and lack merit in any event.

First, the CPUC's efforts to distinguish ACP providers from LifeLine providers miss the mark.[9] Competitive neutrality "requires that universal service 'rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another.'" *MetroPCS Cal., LLC v. Picker*, 970 F.3d 1106, 1111 (9th Cir. 2020) (quoting *1997 FCC Order*). For purposes of that inquiry, it is irrelevant that the California LifeLine program is funded

---

[9] The CPUC points to an FCC report identifying differences between the *federal* Lifeline program (not the *California* LifeLine program at issue here) and the ACP. *See* CPUC Br. 43 (citing *Rep. on the Future of the Universal Serv. Fund*, 2022 WL 3500217, at *22 (FCC Aug. 15, 2022) ("*2022 FCC Report*")).

19

by surcharges while ACP is funded by a congressional appropriation. *See* CPUC Br. 43.

Nor does it matter that ACP support "is primarily designed to support broadband service and, unlike Lifeline, cannot be used for standalone voice services." *2022 FCC Report*, 2022 WL 3500217, at *22. As ACP providers, Assurance and MetroPCS do not provide any wireless plans with only voice service; all ACP recipients have plans with broadband data service in addition to voice and text messaging services.[10] Accordingly, Assurance and MetroPCS customers receiving ACP support use the *same wireless services* as customers receiving LifeLine support.

And there is no dispute that both programs are aimed at the *same populations* of lower-income consumers. Certainly, nothing in the CPUC's Decision exempting LifeLine carriers and their customers from the new connections-based surcharge turned on the particular eligibility criteria for the California LifeLine program. (*See* 2-ER-67.) In sum, there is "no meaningful distinction" between LifeLine providers, on the one hand, and Assurance and MetroPCS (as ACP providers), on the other, "that could justify imposing the higher surcharge only on" Assurance and MetroPCS. *MetroPCS*, 970 F.3d at 1123 (rejecting CPUC's arguments seeking to

---

[10] *See* 3-ER-272–273 (¶¶ 10–11, 14); Assurance Wireless, Affordable Connectivity Program (last visited June 20, 2023), https://www.assurancewireless.com/acp/affordable-connectivity-program; Metro by T-Mobile, Affordable Connectivity Program (last visited June 20, 2023), https://www.metrobyt-mobile.com/benefits/affordable-connectivity-program.

justify disparate treatment of prepaid and postpaid carriers and noting that both "offer the same telecommunications options of voice, text messaging, and data").

For good reason, the CPUC does not attempt to defend the district court's primary rationale for rejecting this claim—*i.e.*, that Assurance and MetroPCS "each have only 'thousands' [of subscribers] in the Affordable Connectivity Program." (1-ER-17–18); Opening Br. 43–44.  There is no support for the proposition that a competitive-neutrality violation can be excused because it affects "only thousands" of customers—a rationale that runs counter to the entire concept of competitive neutrality.  The CPUC cannot overcome that conclusion by rewriting the district court's opinion.  *See* CPUC Br. 44.

Finally, it is irrelevant that participation in LifeLine is "voluntary."  *Id.* at 43.  One could equally say an employee's decision to accept a new job after being exposed to on-the-job discrimination is "voluntary," but that would not excuse her prior employer's unlawful discrimination.  The fact that the CPUC's disparate treatment here predated its new rule (*see id.*) also does not make it any more defensible.

### b.  The CPUC's Rule Discriminates Against Appellants as Compared to Local Exchange Carriers.

Appellants demonstrated that the CPUC's rule violates the competitive-neutrality requirement in a second way:  It unfairly discriminates against Appellants in favor of local exchange carriers.  Opening Br. 46–48.

21

The district court's reasoning and the CPUC's arguments both overlook authority demonstrating "the proper inquiry is whether the *effect* of the legal requirement, rather than the method imposed, is competitively neutral." *Fed.-State Joint Bd. on Universal Serv.*, 15 FCC Rcd. 15168, 15177, ¶ 22 (2000). Here, the CPUC does not dispute that the "effect" of its new rule is that the surcharge burden will fall more heavily on carriers (like Appellants) that derive the vast majority of their revenues from nonsurchargeable interstate services (in particular, mobile broadband) as compared with LECs, whose revenues largely come from surchargeable intrastate telecommunications service. The CPUC's argument (at 47–48) that "revenues" are irrelevant under its new rule simply confirms that "effect" of the rule is disparate treatment of otherwise similarly situated carriers.

The CPUC's focus on whether Appellants or their customers pay the surcharge is a red herring. *Id.* The CPUC asks rhetorically, "What if all of the traditional wireline carriers in the state decided to offer tax-inclusive plans; would that mean the surcharge now discriminates against wireline telephony?" *Id.* But this misses the point. Regardless of whether Appellants or their customers pay—and the CPUC rule harms both Appellants *and* their customers, as Appellants established and *amici* confirmed—wireline carriers are unfairly advantaged because the lion's share of their revenues comes from surchargeable intrastate voice service while the lion's share of Appellants' revenues comes from nonsurchargeable broadband data

services. This same disparate treatment would occur even if wireline carriers decided to pay surcharges on behalf of their customers.

*     *     *

Appellants are likely to succeed on the merits of each of their preemption claims, and the district court erred as a matter of law—and therefore abused its discretion—in reaching the contrary conclusion. *See, e.g.*, *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010) ("[T]his court has oft repeated that an error of law *is* an abuse of discretion") (citing cases).

## B. The CPUC Cannot Rewrite the District Court's Unequivocal Finding that Appellants Established Irreparable Harm.

Contrary to the CPUC's assertions (at 22, 50), the district court unequivocally—and correctly—concluded that Appellants "did establish irreparable injury." (2-ER-26); *see* Opening Br. 48–51. That determination, which the CPUC provides no basis for questioning, was well supported by record evidence: Appellants submitted a sworn declaration detailing the irreparable financial, reputational, and other business harm that Appellants will suffer—and are currently suffering—from the CPUC's unlawful surcharge overhaul. (3-ER-270–279 (declaration).)[11] The district court reasonably credited this testimony. (1-ER-7–18.)

---

[11] The CPUC wrongly argues (at 52) that Appellants have not explained the reputational harm they will suffer. In fact, this was detailed in the declaration supporting Appellants' preliminary injunction motion. (3-ER-278–279 ¶¶ 31–35 & n.7.)

Left with nothing else to challenge the district court's finding of irreparable harm, the CPUC launches a baseless attack on Appellants' litigation conduct. CPUC Br. 50–52. First, the CPUC incorrectly suggests that Appellants did not act quickly enough in pursuing their claims. But the CPUC's written decision was issued on October 24, 2022, and Appellants filed their Complaint and preliminary injunction motion on February 1, 2023—two months *before* the CPUC's rule was scheduled to go into effect.[12] When the district court denied that motion, Appellants filed their notice of appeal and asked that court for a stay of the connections-based rule the next business day. And when that request, too, was denied, Appellants sought emergency relief from this Court the following day. Appellants have diligently pursued their claims.[13]

Next, the CPUC makes the paradoxical claim that, rather than pursuing an interlocutory appeal on an expedited schedule, Appellants would have been "better served" by continuing to press their preemption claims in the district court—the same claims that the district court had already rejected. *See* CPUC Br. 51–52 (citing

---

[12] By contrast, *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985), cited by the CPUC (at 51), involved a "long delay" of almost a full year—even though the alleged harms occurred well before the plaintiff filed suit and even became moot with the passage of time (unlike here).

[13] The CPUC's argument that Appellants "agreed to a briefing schedule that put the district court's decision on the eve of the new rule's effective date" is particularly disingenuous because it neglects to mention that the CPUC requested—and, as a courtesy, Appellants consented to—a twelve-day extension of its deadline to oppose Appellants' motion for a preliminary injunction. Dist. Ct. Dkt. Nos. 19–21.

*Glob. Horizons, Inc. v. DOL,* 510 F.3d 1054, 1059 (9th Cir. 2007)). But in *Global Horizons* and the earlier case it cited, there was good reason to believe that a more "fully developed factual record" later in the litigation "may be materially different from that initially before the district court." *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982). Not so here, where Appellants assert a facial preemption claim that raises a pure question of law and where there are no disputed facts concerning their competitive-neutrality claims. Indeed, the CPUC has not sought any discovery from Appellants and acquiesced in a request to stay district court proceedings while this appeal is pending. *See* Dist. Ct. Dkt. 58–59. In short, there is no reason to believe further development of the record below would inform an analysis of the pure legal issues presented here.

### C. The CPUC Will Not Suffer Any Harm from a Preliminary Injunction, which Will Further the Public Interest.

Appellants demonstrated that the CPUC would suffer no harm from a preliminary injunction, which would promote the public interest in light of the inequitable effects of the new rule. Opening Br. 52–56. The CPUC has not shown otherwise.

*First*, Appellants demonstrated that the district court's one-sentence public interest finding was itself based on a legal error in interpreting and applying Section 254(f). *Id.* at 53–54; (*see* 1-ER-19 ("But the public interest is advanced by sustaining universal service, as the PUC's rulemaking process established.").) The district court's erroneous interpretation inverts the statutory scheme, and it "is clear that it

25

would not be … in the public's interest to allow the state to violate the requirements of federal law." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017). The CPUC makes no effort to refute that argument.

*Second*, Appellants demonstrated that retaining the CPUC's longstanding revenues-based rule would not expose the CPUC's universal service programs to any risk of underfunding, as the CPUC routinely adjusts its surcharge rates to ensure stable and consistent funding. Opening Br. 17, 22, 52. The CPUC (at 54) "acknowledges that it can do so." And it does not dispute that California can benefit from the recent influx of *billions* of dollars in federal funding for universal service programs within the State. *See* Opening Br. 15, 52; CPUC Br. 53–57. Instead, the CPUC vaguely asserts—without any evidence or explanation—that its longstanding revenues-based regime is "unsustainable" and insists that adjusting its surcharge rates would be "unfair" to those who would pay more. CPUC Br. 53–54. That argument is circular and contrary to the FCC's and (until recently) the CPUC's own position that surcharge payments should be *proportionate* to usage of surchargeable service. *See supra* at 9. The CPUC simply assumes it is now more "fair" for all customers to pay the same amount, regardless of the amount of surchargeable service each customer uses.

*Third*, the CPUC argues that if this Court reverses, the CPUC will incur administrative costs by reverting to the revenues-based mechanism that it has used for

26

decades. CPUC Br. 54 (citing SER-11–14 (declaration filed in Ninth Circuit in opposition to stay motion)). But the cited declaration is not part of the record before the district court and therefore is not properly considered on appeal. Fed. R. App. P. 10(a); *see, e.g.*, *N.D. v. State of Hawaii Dep't of Educ.*, 600 F.3d 1104, 1113 n.7 (9th Cir. 2010) (declining to consider declarations purporting to show harms on appeal because Court "view[s] only the district court record on appeal").[14] In any event, the purported costs are speculative, and the CPUC never attempts to justify the counter-intuitive assumption that it would cost as much to revert to its old, revenues-based mechanism as it cost the CPUC to create an entirely new one. (*See* SER-11–12, ¶ 4.) The CPUC's "evidence" is insufficient to justify denying a preliminary injunction, *Amylin Pharms., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011), and Appellants' strong showing of irreparable harm is "far more compelling than the possibility of some administrative inconvenience or monetary loss to the government." *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983).

The CPUC next "presum[es]" that "the wireless industry" and other carriers will be harmed by a preliminary injunction (Br. 54–55), but ignores the fact that wireless carriers—as well as individual consumers and consumer groups—*opposed*

---

[14] The CPUC filed a different declaration when opposing a stay of the connections-based rule pending appeal (though not in opposition to the preliminary injunction motion) in the district court, but that declaration admitted that the CPUC could not even "estimate" the cost of simply reinstating its longstanding mechanism. *See* Dist. Ct. Dkt. 45-1, ¶ 4.

the new rule. Opening Br. 18–21. Regardless, the CPUC fails to present any evidence that it will be unduly difficult or confusing for carriers to simply revert to how they have calculated and remitted surcharges for decades.

Finally, the CPUC continues to minimize the disproportionate impact of its new rule on wireless-only households—especially among lower-income communities who rely on wireless service to access the internet and elderly individuals for whom wireless service is a "lifeline" to stay in touch with family and seek help in emergencies. *See* Amicus Br. for Multicultural Media, Telecom & Internet Council, ALLvanza, NAACP (CA/HI Chapters), and LatinoJustice 8–13; Opening Br. 20–21 n.6 (citing public comments (2-ER-264–266)). To the extent the district court and the CPUC suggest that consumers in rural communities do not rely on wireless service—and thus will not be harmed by the new rule—that is incorrect. *See Commc'ns Marketplace Rep.*, 2022 WL 18110553, at *63, ¶ 152 (FCC Dec. 30, 2022) (noting extensive wireless coverage in rural areas); *see also Remarks of FCC Comm'r Geoffrey Starks Before Ericsson's 2022 Broadband for All Summit Stockholm, Sweden*, 2022 WL 2354507, at *5 (June 27, 2022) (acknowledging farmers' use of wireless service in rural areas).

The balance of the equities and the public interest decisively favor Appellants, and support reversing the district court.

28

## CONCLUSION

Appellants respectfully request that the Court reverse the district court's order and remand with instructions to preliminarily enjoin the CPUC's connections-based rule.

June 20, 2023                                    Respectfully submitted,

DLA PIPER LLP (US)

By: */s/ Peter Karanjia*
Peter Karanjia
500 8th Street, NW
Washington, DC 20004
(202) 799-4135
peter.karanjia@us.dlapiper.com

Kathleen S. Kizer
500 Mission Street, Suite 2400
San Francisco, CA 94105
(415) 836-2500
kathy.kizer@us.dlapiper.com

Ben C. Fabens-Lassen
Gaspard Rappoport
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067
(310) 595-3000
ben.fabens-lassen@us.dlapiper.com
gaspard.rappoport@us.dlapiper.com

Attorneys for Appellants-Plaintiffs

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This Brief conforms to length limitations permitted by Ninth Circuit Rule 32-1(b) because it contains 6,993 words, excluding the portions exempted by Fed. R. App. P. 32(f) and Ninth Circuit Rule 32-1(c).

2.      This Brief complies with the typeface requirements of in Fed. R. App. P. Rule 32(a)(5) and the type-style requirements of in Fed. R. App. P. Rule 32(a)(6), because it was prepared using Microsoft Word 2016 and is written in 14-point, proportionately spaced Times New Roman font.

June 20, 2023

*/s/ Peter Karanjia*
Peter Karanjia
DLA Piper LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
Tel.: (202) 799-4135
peter.karanjia@dlapiper.com

*Counsel for Appellants-Plaintiffs*